OVIATT *vs.* HUGHES and others.

On the 15th of September, 1855, a manufacturing corporation, by resolution, appointed K. its general agent and attorney, agreeing to pay him a salary of $1000 a year, to commence on the first day of that month, besides expenses ; but no time was fixed when the salary was to become due and payable. *Held* that the company did not contract a *debt* within the meaning of section 12 of the act of February 17, 1848, authorizing the formation of corporations for manufacturing and other purposes, for the salary of K. when they adopted that resolution. Nor did they contract

a debt for his services from day to day, or month to month, as they were rendered; the statute speaking of "debts" existing or contracted, not of *liabilities* which may ultimately ripen into debts.

That K. was to be paid a price agreed upon, *by the year*, for his services; and there being no express stipulation as to the time when he was to be paid, he was not entitled to pay, by the terms of the resolution, until the expiration of a year from the time when the salary was to commence. But that the time of payment might be changed by a subsequent agreement terminating the employment and allowing K. compensation at the rate of $1000 a year, for the time already elapsed.

*Held, also,* that the expenses of K., incidental to the business, were put upon the same footing, as his salary, in respect to the time when they could be considered a debt against the company. And that upon the failure of the trustees to make the report required by the 12th section of the act of February, 1848, the corporation was to be deemed indebted to K. only for such expenses as he had paid or incurred up to that time.

THIS action was brought to recover of the defendants personally a certain debt due from the Rochester Iron Works to Rufus Keeler, and by him assigned to the plaintiff, on the ground that the defendants as trustees of said company did not file or publish the report required to be filed and published by the 12th section of the act to incorporate manufacturing companies, (*Laws of* 1848, *p.* 57; 2 *R. S.* 5th ed. *p.* 661,) of which this is one, in the year 1857. The company was organized July 20, 1854, for the purpose of manufacturing Hughes' Atmospheric Trip Hammer, and disposing of the same in the United States and in foreign countries. Keeler was one of the original trustees, and president of the company. The original capital of the company was $5000. This was afterwards and prior to January 1, 1856, increased to $100,000, by the purchase of Mr. Hughes' right. In September, 1855, Keeler was employed by the company as its general agent and attorney, at a salary of $1000 per year and his expenses. In the fall of 1855 he went to Europe on the business of the company, to wit, to make sale of hammers and to obtain patents from certain of the European governments; and while so absent he incurred expenses on account of the company, which, together with his salary, amounted

to $1879.34. The account was at last settled, after allowing payments, at $800. In July, 1856, Keeler resigned as president and trustee. In September, 1857, he assigned his claim to the plaintiff, who brought suit against the company, and on the 3d of January, 1860, recovered judgment. On the trial of the present action there was evidence given to show that Hughes, one of the defendants, was one of the trustees of the company; also evidence tending to show that he was not. As to the other defendants, there was no question that they were. It was admitted by the answer that the report required by law was not filed within the first 20 days of January, 1857. The defendant moved for a nonsuit, which was granted. Exceptions were taken by the plaintiff, on the trial, which were ordered to be heard in the first instance at a general term.

*Wm. F. Cogswell,* for the plaintiff.

*George G. Munger,* for the defendants.

JAMES C. SMITH, J. This action is brought against the defendants as trustees of the Rochester Iron Works, a corporation organized under the act authorizing the formation of corporations for manufacturing and other purposes, passed 17th February, 1848. The object of the action is to enforce a liability imposed by the twelfth section of the act, which provides that every company organized under the provisions of said act shall annually, within twenty days from the first day of January, make a report as prescribed in said section, "and if any of said companies shall fail so to do, all the trustees of the company shall be jointly and severally liable for all the debts of the company then existing, and for all that shall be contracted before such report shall be made." (*Laws of 1848, ch. 40, p. 57, § 12.*)

The claim which the plaintiff seeks to recover was assigned to him by Rufus Keeler, and is for services rendered and ex-

penses incurred by Keeler in the employment of the company. Keeler was one of the trustees of the company from the time of its organization in 1854, to 28th July, 1856, when he resigned. The plaintiff claims that the defendants are liable on account of a default which occurred in January, 1857, after Keeler ceased to be trustee.

The defendants insist, however, that the claim which the plaintiff seeks to recover, was an existing debt of the company when the default occurred in 1856, or was contracted during its continuance. If this position were warranted by the evidence, the plaintiff could not recover, inasmuch as the official term of his assignor covered the period of that default, and he was responsible therefor equally with his associates ; but I think the position above stated cannot be maintained.

In the first place it is to be observed that the default which happened in January, 1856, ceased on the fourth day of February, in that year, on which day the trustees made and filed a report. (*Id.* § 12. 17 *N. Y. Rep.* 458, 466.) The defendants claimed upon the argument that the report referred to was not made by a majority of the trustees, and therefore was a nullity. The printed case does not show whether the report was signed by *any one,* nor that any point in respect to the want of signatures was raised at the trial. But the case does show that the report was duly verified by the oaths of the president and secretary, the former of whom was required by law to sign it, and that it was filed. In these circumstances, I think it is fairly to be inferred that the original report produced at the trial was properly signed.

It is to be noticed in the next place, that Keeler acted under a resolution of the company, adopted 15th September, 1855, appointing him the general agent and attorney of the company, by the terms of which resolution he was to receive a salary of $1000 a year for his services, besides expenses ; the salary to commence 1st September, 1855, but no time was fixed *when it was to become due* and payable. The services

were rendered during a period of eight months, commencing some time in the fall of 1855, and the expenses were incurred from 14th November, 1855, to 17th May, 1856, inclusive. On 19th May, 1856, the directors appointed a committee to audit his accounts and report; on 28th July, 1856, his resignation of the offices of president and trustee was tendered and accepted; on the next day the committee audited his account at $800, after deducting a payment of $1000, which appears to have been previously made, but at what particular time is not stated, and allowing an item of $666.66 "for eight months' services, as per resolution." On 5th August, 1856, the committee reported their action to the board, and the bill was audited and ordered to be passed to Mr. Keeler. In rendering the services above mentioned, Mr. Keeler went to England, in the fall of 1855, and returned about the middle of May, 1856.

I do not think the company contracted a *debt*, within the meaning of the 12th section of the act above referred to, for the salary of Mr. Keeler as their agent, when they adopted the resolution appointing him such agent, nor that they contracted a debt for such services from day to day, or month to month, as they were rendered. The statute speaks of "debts" existing, or contracted, not of *liabilities* which may ultimately ripen into debts. Keeler was to be paid a price agreed upon, *by the year*, for his services; and as there was no express stipulation as to the time when he was to be paid, I think he was not entitled to pay, by the terms of the resolution, until the expiration of a year from the time when his salary was to commence. There would therefore have been no "debt" against the company, on account of his salary, until he had rendered a year's services, but for the modification of the contract in July, 1856, terminating the employment by mutual consent, and allowing him compensation for the eight months' services theretofore rendered, *at the rate* of $1000 a year. (12 *John.* 165. 13 *id.* 53. 17 *New York Rep.* 465.)

Oviatt *v.* Hughes.

I am also inclined to think that the expenses of the agent "incidental to the business" are, by the terms of the resolution under which he acted, put upon the same footing as his compensation for services, in respect to the time when they could be considered a debt against the company; but however that may be, it is clear that on the 4th day of February, 1856, the company was indebted only for such expenses as the agent had paid or incurred previously to that time. The amount of his expenses at that date does not distinctly appear, but the defendants' counsel estimated it on the argument at 25/60 of the expenses of the trip to Europe, or $505.28. Assuming the estimate to be correct, the remainder of the claim, amounting to $1294.72, was not a debt against the company until after the 4th of February, 1856. Assuming also the correctness of the defendants' position, that the payment of $1000 should be applied first to that portion of the claim not affected by the default of the plaintiff's assignor, a point which in the view I take of the case it is not necessary to decide, and upon which I do not express an opinion, there would still remain a balance which the plaintiff was entitled to recover.

I am of the opinion that the other grounds upon which the defendants moved for a nonsuit are also untenable, and as it is understood that the judge at the circuit so regarded them, I have not deemed it necessary to state the reasons which lead to this conclusion.

If these views are correct, there should be a new trial.

WELLES, J. concurred.

JOHNSON, J. dissented.

New trial ordered; costs to abide event.

[MONROE GENERAL TERM, December 1, 1862. *Johnson, J. C. Smith* and *Welles,* Justices.]